Good morning. Judge Kleinfeld and I are very pleased to be joined here in Seattle by Judge Ezra from the District of Hawaii, but via Texas. We really appreciate his help and welcome him to the Ninth Circuit. It's a pleasure and honor, thank you. And we will be hearing the cases today in the order in which they appear on the calendar. The first is Edmonds School District v. A. T. 17-35985 and each side has 15 minutes. Your Honor, may it please the court, I'm William A. Coates, attorney for Edmonds School District. I'd like to reserve five minutes for rebuttal if I may. The issue in this case arises out of the parents unilaterally placing A. T. in a program in Provo, Utah, which was a lockdown program. Could you tell me what the record reveals about the extent to which the facility can be identified as a school versus the extent to which it can be identified as a hospital or other medical facility? Just tell me what the record is to show whether it's a school or a hospital. The record shows when he went down there, I think everybody agrees that he was experiencing an acute psychological breakdown. He'd been identified with pedromal schizophrenia. He had other disabilities, oppositional, defiant. Yeah, we know all about that. I think the case really turns on whether he's getting medical care with a little schooling or whether he's going to a special school with some auxiliary supporting medical care and that's why I asked the question. And we, I agree with that judge that when he went down there, he had been on the streets. We know that he was... Look, we know all the background. Could you try to help me with my question? Well, they placed him in stabilization. Stabilization was where he was essentially isolated, had to wear a uniform. I'm going to give you one third chance to tell me the extent to which the record reveals whether the facility that he's at is a school with supporting medical services or a medical facility with supporting educational services. He was under the care of a psychiatrist when he went down there. When he went down there, he was not under medication. They placed him under medication. When I refer to stabilization, during the first six weeks, the educational program, if anything, was on kind of a haphazard basis to paying. The clear emphasis was on his medical condition. He was given, you know, they'd line up and give him medication. After that initial period, wasn't his day mostly school classes with only therapy for a short time at the end of the school day? The question is when do you have to make the determination and what is the time when you make the determination on the unilateral placement? It's our position that without medical intervention at that point, no educational program was going to be effective. You'll see that going back to Dr. Kachet's report, that she felt at that time he needed to be admitted to Western State Hospital, which is a residential psychiatric hospital in the state of Washington. When he was picked up off the street and he was taken to Children's Orthopedic Hospital, they said that what he needed was a residential mental health facility that would deal with his substance abuse as well. When he went down there, they locked him up, put him in stabilization under the care of a psychiatrist, and indeed they found that there was a medical, you know, emergency or that it was medically mandated that he be there. The educational program, you know, this was a student who did well, you know, in school up through ninth grade that he, for example, performed at the top 10% of his class in mathematics. But didn't the schizophrenia not start until after that? It did, and that's the point, Judge, is we are capable of providing an educational program that as he, you know, at the end of his ninth grade year, he started having significant problems at home where he became assaultive towards his parents, that he was living on the street, and he engaged in behavior. It's behavior we didn't see at school in ninth grade. Right, but he didn't have the disability that's the main issue of this case at that point. Well, this is when it started. In that summer when things broke down at home, you know, we believe the schizophrenia was part of the cause, and I think that Dr. Kashet referred to it as the perfect storm. Prodromal means early, basically. It means incipient or early or beginning schizophrenia. It's a disease, typically people get full-blown schizophrenia in late adolescence or early adulthood. Correct, and so I understand that, and I believe that to be true. That summer, he goes to the juvenile court and they get an at-risk youth petition. Now, the district's not involved in this, didn't know about it. He comes back in tenth grade, and it's a student we've had significant success with. If you look at his... But tenth grade didn't go very well, right? Well, that's true, but his special ed program was all regular classes with 75 minutes per week of And then in tenth grade, where it really breaks down is he... And again, it's... He starts going into the girls' restroom, so he gets a short-term suspension in January, right at the start of January. He comes back for one day, brings a weapon to school, a slingshot, call it a wrist rocket with ball bearings, and so it falls under our weapons. He gets a long-term suspended. To give you some idea, at that point, we believe there's significant psychiatric issues at that point. And did you change his IEP to address those? There was... Well, there was an IEP meeting, and at that IEP meeting in January, the parents advised us he's getting a comprehensive medical health evaluation. The problem is, you know, when we set up... So, you know, he goes in, and because it was reported to law enforcement, he was in an educational program that was provided by Everett School District, because he's in the juvenile facility. Of the 45-day suspension, he was only at home. He's either on the street or in the juvenile facility, all but seven days of it. I thought the critical meeting for the individualized educational plan, the parents weren't there, and according to the findings of fact, they weren't invited. But the question, Judge, is... The point is, his medical condition was so overwhelming that there's nothing we could do. He came, we... I think everybody agreed... How did the school even know that, though? The district didn't really do anything to evaluate him. You never evaluated him to come up with a new IEP. The parents... When he was suspended, then the parents came, you know, to... Once he was suspended, they asked to be extended until we could get the report. We got the report. There was kind of an agreement. We'd try him at Scriber, which is a smaller school. He shows up for one day, and then he's gone. And then he's on the street. He's, you know, in juvenile facility before a juvenile judge. You know, when you say, well, we could write prior written notices. We can write an IEP. Our view is, his mental health condition at that point was he was totally out of control. His parents could not get him to come to school. They could not get him to stay home. He's on the streets in Seattle. And so, when it comes around to the following fall, you know, we agree. There's no question in our mind that, in fact, that, you know, when he goes, he's picked up at the end of September. There's an October 3rd report from Children's Orthopedic Hospital saying he needs residential placement for mental health reasons, as well as substance abuse. When he goes down to answer your question, they don't just start him in a regular educational program. They have him in the stabilization, would be, you know, you know, dealing with his mental health issues. And they have him working with a psychiatrist. They are indicating medical necessity. You're talking about the Utah School now? Correct. Provo, Utah. Where in the record is this instruction that he needs to be in a medical facility? He was picked up by law enforcement and he had an infected foot. They took him to Child Orthopedics Hospital. There's a report that comes from them dated October 3rd. It's his discharge report. And they say that he needed to be in a residential mental health facility. Do you know where in the record that is? I just don't recall that. Unfortunately, I don't. You know, I certainly can get that for you. I don't have a citation. Is it in our record? It is in the record, yes. Well, you know, counsel, the thing that is bothering me a bit about the approach that you're taking here, it seems to me that your treatment, as well as education, in a residential facility, that disqualifies them from reimbursement for that facility. When in fact, most of the, including cases from your own district that you represent, most of these circumstances where children are required to be placed in a residential facility are cases where they have been acting out. I mean, you don't have to have schizophrenia. There have been many, many cases reported where children with severe autism will act violently toward parents and others, be a danger to themselves. They have to go there and receive extensive treatment, get stabilized, and then they go into their education program. I'm a little concerned that the approach that you're taking is so shotgun that it would, in effect, almost nullify the provisions of the Act for those children who have severe mental health impacts and thus have to go to a residential school that will provide them with treatment so that they can get the education that they're that I'd point out to you. He was not fixed and stable. He was not receiving medical care. Well, no, they don't send, you know, that the, having handled these cases on both sides, both from a district court perspective, which is where I usually sit, and then by designation, the cases that I have seen where children are referred, because you know that the the mandate of the law is that they're to be mainstreamed as much as possible, right? Absolutely. You would agree with that, right? The least restrictive environment. Well, when you get to the point where even the school district, in many cases, says this child has to go into a residential treatment facility, there is already a child who is completely, generally, completely unable to function in the classroom such that they don't disrupt the whole school, is violent or acts out in other ways. I mean, we had, I had a case once where the child was throwing his own defecation at people. So, I mean, he needed to be stabilized and he was stabilized. And he was stabilized through medical interventions. Of course. And well, that's But all of these children received medication. What you're rejecting, you're rejecting the analysis of both the Clovis case of the Ninth Circuit and EH and the two Ashland cases. I don't think so. That says the primary, absolutely. If the primary case, if the primary reason for the kid to be in a in a hospital, you put him in a psychiatric hospital and that's where he stays, of course he can't get But if you, if you put the child into a facility where the primary reason is education and we're going to stabilize him so he can get that education. Clovis developed the standard, and I agree, it's a psychiatric hospital. Take a look at the two Ashland cases. Neither was a psychiatric hospital where it was placed. One of them was in Utah, which was very similar to this pursuit. They developed the test. It's a three-pronged test. And they say, again, in those cases, they have a primary reason for medical or educational. In this case, it is absolutely clear. Now, it has to be determined at the time of placement. Let me ask you that. Whether it's absolutely clear, I realize I've already asked you this three times, but I'm still not clear on what your answer is. There are some placements for children in medical facilities where they just get a little bit of enrichment so that they don't forget how to read or something like that. They just get an hour or two. There are some long-term placements where the kids basically are in a school that happens to have a full-time school nurse and they just have to go to the nurse's office once or twice a day to treat their asthma or diabetes or something. In this one, it's closer to the first and not the second. However, it looked to me like the schedule at this one was a full school day, just as many hours of classes as you'd get if you were in just an ordinary high school. Am I mistaken on that? Does the record show something different? I don't use an IEP. You know, they tested him at 12th grade plus and he was put in, you know, 10th grade. He repeated geometry. We weren't enamored with our educational program. My point is, though, before he got there, when you say he came down... Hold on. My question, I know you're having trouble with this and I don't know why. My question right now is, does he have a full school day, about as many hours of classroom instruction in this facility as he would get in the high school? Ultimately, I think the answer is, you know, in hours he did. My point is, when he went down there, he was under the care of a psychiatrist who provided medication to him. Of course, he has progromal schizophrenia.  placement, you know, you'd have the medical intervention. Then this, normally, some other time there'd be an IEP. To meet your question, is it the least restrictive environment? To follow up on my friend Judge Kleinfeld's question, your concern appears to be, in your position, that if a child goes into a residential facility and is unable to immediately, immediately go right into the educational program without any medical intervention at all, then that child is disqualified. No, I didn't say that. Well, let me explain how it's supposed to work. They go, they get medical intervention. At some point, if that's successful, there should be an IEP and that's a new, there should be a meeting and then there should be a placement and you look at least restrictive. Here, when they took him down there, there's no question he needed medical intervention at the start. That was the reason for sending them there. That was the reason for locking him up. At some point, you are correct in saying, maybe the emphasis was more on education. But when you determine a unilateral placement, you don't wait, you have to determine it at the time they're sent, whether or not it's for medical reasons or not. That's what Clovis says, that's what the two Ashland cases say. Are you saying that everything depends on when he's sent as opposed to what happens when he's there? No, when he was there, when he first went there, it was under the care of a psychiatrist that prescribed medication. Please try to listen to my question. Oh, excuse me. I want to know if you think the law is that the determinative factor is not what happens at the facility after he's stabilized. If you think the determinative factor is whether the reason he was sent to the facility in the first place was entirely disease related. Judge, I think you have to make the determination at the time of admission when the district makes its decision, was it for medical reasons or not. It's just like if you go into a hospital, you know, a hospital for physical things. We're not responsible for that. You might not be able to learn. There's a point where as you get better, we provide services. The same with mental health. He went down there. Let me test that against another type of disease. We don't have it so much anymore, but it used to be that in Alaska, a lot of the native children had tuberculosis. They would get sent to a native health service hospital, Alaskan Native Health Service Hospital. And before anything else could happen, the tuberculosis had to be treated and stabilized. And then once it was, they'd go to school at the hospital because they still couldn't be sent back to their village. I agree. Is that school or is it purely a medical treatment that doesn't get reimbursed? At the time they were sent, it was because of the tuberculosis and nothing else. But what they did when they were there, often for a few years, was go to school. See, that's a good analogy, Judge. When they were in the hospital, the district's not responsible for that cost. That'd be So are you really just arguing that you shouldn't have to pay for the first six weeks he was there? No. Once he's there, they kept him. They made the choice. They excluded us. There should have, very likely, could have been an IEP meeting at that point to see, you know, what is the least restrictive environment. Did he really need to be locked up? We were precluded from doing that. And, you know, the question, you know, to use your analogy, is once, let's say, there's no longer, how long does he get to go? We kept asking him, when does a person get released from this? And what's the criteria? And it wasn't educational. He was, you know, performing real well, you know, in their classes at the time of the hearing. And we said, well, when do we get him back? What's the criteria? And they said, no, that's not the criteria. Look at what the judge ruled. He said, we, the educators, didn't get to make the decision of how long he was there. He left it to the team at Provo, and then if they couldn't agree, Dr. Cachette. Okay, you're way over your time, so thank you, counsel. I'll give you one minute for a rebuttal anyway. I appreciate it, thank you. And maybe you could find that citation I asked about for when you come back on rebuttal. My name is Charlotte Cassidy. I'm appearing here on behalf of IT, RT, and AT, and sitting at counsel table with me is Nicole Manero, an attorney from my firm who also worked on this case. I'm going to try to address some of the court's concerns initially and forego some of the speech that I had written and just go straight to what you seem interested in. First of all, the district did not really question the integral relationship between AT's medical and educational needs until the presidential placement. He had always been on behavior intervention plans. He had always received special education or behavioral issues from preschool. He had always had behavior intervention plans, so the district had implicitly recognized throughout his school career that his mental health conditions and his behaviors impacted him educationally. Let me get some clear focus. How do you distinguish these cases that say, nope, it was medical, it wasn't an alternative schooling program like Ashland and Clovis? Okay. How do you distinguish them? Well, Judge Kleinfeld, I would, first of all, the case involving Clovis, would you like me to answer the question concerning the distinction between the Clovis placement? That you were writing the decision. And now you came to the part of the decision where you had to explain why this case is not simply a straightforward application of Clovis and Ashland. Sure. Or, give me the paragraphs. Okay. Well, first of all, the Clovis placement, the Clovis decision actually sets out a number of detailed criteria for distinguishing a residential placement from an educational, a residential educational placement from a hospital placement. And I'd like to start out talking about the stabilization unit. The student was there for about four to six weeks, and the record will show that that unit at Provo Canyon is a unit that incoming students are standardly put in. So he went to that program not because he was out of control behaviorally at a level where he needed inpatient hospitalization. It wouldn't qualify as an hospitalization, that particular unit at Provo. I'll talk about that in a minute. But they went there just as a matter of routine. Students went there. There's some evidence in the record, and you'll see this, that he may have gone back in February because, in fact, but it's unclear, and Judge Minster, the administrative law judge, found it was not necessary to her decision. Because sometimes students will be sent back there from, to the stabilization unit if they need additional assistance. The stabilization unit itself provides one to one academic instruction. So it provides more intensive academic instruction, and it does include enhanced therapeutic services. Is he still there? He's not, your honor. Has he aged out? He did age out. He left in July of 2017. Because he aged out? Yes, he turned 18 and left. So the placement at Provo Canyon differs from the King's Hospital placement in Clovis in a number of significant respects that were identified. First of all, Clovis talked about the length of time the student spends in school, whether school time is just secondary to therapeutic needs. And in Clovis specifically, at Kingsview Hospital, the student was spending, I believe, six hours in therapies and only a couple of hours, I think, two a day. Unlike that, in Clovis, I'm sorry, your honors, at Provo, the student went to school from 845 to 320. He had a regular school day, and he had a couple of hours of therapy in the afternoons. Additionally, the Clovis court looked at accreditation. Kingsview was accredited as a hospital, I believe that's the way the court put it, and Provo Canyon is accredited as a school. Additionally, in the record, the record is so big and it's so hard to find stuff. Trust me, I know. Yes, it is, your honor. And it's, it's, it was, it's in my brief, actually. And additionally, so it's an accredited school, he spends a full school day there. Yes, yes. Additionally, the Clovis court looked at who controlled the student's program. And that, for example, at that, at Kings Hospital, Kingsview Hospital, the doctors, physicians, there was a big staff of physicians, and physicians controlled the student's program. At Provo Canyon, AT's program was determined by a treatment team, and the treatment team did, had, basically came from three different departments, the four different departments of the school. The student life department, which can, which basically worked, they worked with students on weekends and in the evenings in the dorms. The clinical department, those were the therapists who provided therapy to the student. The educational department, those were the teachers, and the medical department. So there were essentially four different departments there. You know, let me, may I ask you a very quick question? One thing that I think, if anything cuts against your argument, as I looked at the record here, the one thing that appears to, is the way in which the administrative law judge felt it necessary to control, have control over his continued placement there. So instead of educators being involved, it was a doctor. That, you know, generally if you're going to a hospital or a psychiatric hospital, it's a doctor that is going to, a doctor or a team of doctors that's going to certify when you are capable of being discharged. It almost appears that that is the manner in which the administrative law judge originally set this up, which was later affirmed by the district court, that this doctor had the ultimate say-so as to how long. And that's the complaint from the school district, is that they were kind of cut out of the process, and so it wasn't an educational process, it was a medical process, which is why a doctor had to certify that he could be released. Now, how do you respond to that? I understand your question, Judge Ezra. Well, first of all, it wasn't a doctor, it was a psychologist. Well, a psychologist. Was it a PhD psychologist? Yes. Okay, that's a doctor. But not a medical doctor. Well, okay. I think you're going to get on the opposite end of the psychology community here. Well, Your Honor, let me answer that in a broader sense. And this argument, I believe, appears, let me make sure about this, at 56 and 57... In many states, psychologists, I don't know about Utah, but in many states, psychologists can prescribe medication. Yes. Well, actually, Your Honor, I think what the court ordered was that, so there's testimony and hearing that the student might be eligible at some point during the duration of his stay at Provo for a step-down residential placement, so a less restrictive residential placement, or even possibly, depending on his progress, to come home, but they said he would have to have a very strict outpatient type of placement. So I think our services, outpatient services. So I think what the court, as I understand what the court ordered, the court ordered for one year only, which is the duration of an IEP, that the decision about the student's exit from Provo Canyon would be made by the teachers and that ultimately, and at Provo, Provo staff, and also Dr. Kachat, but in consultation with school district staff. Now, the school district staff, and that actually is very much like an IEP meeting, more than it is like a medical assignment. I misunderstood the record. I thought that the psychiatrist had the, or psychologist, had the definitive say-so. Right. Am I misreading the record? I might be. She assigned to Provo Canyon staff and Dr. Kachat the decision of where AT should attend school should Provo determine AT was ready to leave. But if they disagreed, then Dr. Kachat would make the determination. That's what I meant. That is correct. That was what I, my position. Okay, that's correct, Judge Friedland. What I would say about that, Your Honor, first of all, as I've already said, she's not a medical professional, but also I think that the IEP process without, by having, because those are the individuals who would be at an IEP team meeting. Individuals who would be there would be a, the staff who were educating the student, and individuals who were knowledgeable about the student's disabilities and their implications, their educational implications, I would call that Kachat. For example, school psychologists are often members of IEP teams, and they conduct the evaluations. So I think in many ways the court was trying to replicate an IEP team. Under the law, however, and I have cites to this in my brief, under the law, the court would not have been permitted to delegate the decision to the school district. I mean, the school district complains that it was not, that control was wrested from it, but that's kind of inherent in any situation where an administrative court issues an order overriding a school district's determination. So I think, go ahead. Well, let's, let's assume for the moment that a psychiatrist and a psychologist are both medical professionals, okay? Because you, what you're arguing to me makes no sense in the sense that if you go to a large clinic or hospital and you have problems with your eyes, they are going to have ophthalmologists. Ophthalmologists are MDs, optometrists are not, but they're both medical professionals. If you can, if you can prescribe medication and you're working on somebody's mental health, how can you say they're not a medical professional? But let's assume that, that, that the psychiatrist, psychologist here is a medical professional, all right? Then, then make that argument. How does that work? Okay. Assume she's, assume Dr. Kachat is a medical professional. Well, under CAFRO, I don't believe medical professionals, let me just think about that for a moment, Your Honor. Now, maybe there's a special definition, I've never seen it. Right. In, in the legislation. Yeah. I think, Your Honor, I guess what I would go back to is I think in that particular situation, that even if, even if, and I think it's important that Kachat was not a psychiatrist, and it's important under TATRO and a number of other decisions, but I think in that particular situation, what the judge was attempting to do into her broad powers of equity was to try to set up some stability in the student's program if he was ready to move to a less restrictive environment. And I think that if you look at the record, the only individual who had evaluated this student since January of 2013 in his eighth grade year, the only evaluation that had been conducted, and by the way, Dr. Kachat felt that the onset of prodromal schizophrenia was in, was in the, during, sometime during the ninth grade, the only individual who had evaluated this student, the only evaluation that had occurred was Dr. Kachat. And so I think for that reason, the court was choosing her to make a final decision over that one year period only, that is the standard length of an IEP, in order to give the student the option of a less restrictive environment, but at the same time maintain stability over the student's program. And I really think even if it was, yes? Can I ask you about mootness related to this issue? Yes, Ms. Midland. So if, let's say that ALJ overstepped and shouldn't have given Dr. Kachat as much authority to make this decision, did that error only matter from the time of the ALJ decision until when the district appealed? Because as soon as the district appeals, it's the stay put provisions and not the provision in the ALJ's order anyway that determines where he stays? That's correct, actually. So how long is that time between when the ALJ ruled and when the district appealed the ALJ decision? It must have been, Your Honor, actually it had to be within 90 days. It must have only been two months or something like that. Yeah, it had to be within 90 days. So it doesn't seem like there was any, I mean, no one tried to say he could move in those 90 days anyway. I'm confused about how this issue matters. I wonder if you could speak to that. Well, I don't think it does. I mean, I, you know, first of all, as I just  said, the district did not offer any additional evidence at hearing that it evaluated, and it could have, didn't attempt to, that it attempted to evaluate the student during that time period, that it came up with some other suggestion about where the student would go, that the student moved to a different, less restrictive placement, and that essentially it was precluded from having any say in that, or that Dr. Kitchat made that decision.   didn't attempt to, that it attempted to evaluate the student during that time period, and it came up with some other suggestion about where the  restrictive placement, and that essentially it was precluded from having any say in that, or that Dr. Kitchat made that decision. She didn't. I mean... But isn't the real answer here, even, I think Judge Friedland made an excellent point about mootness, but even if it isn't moot, that the reason the ALJ, in all likelihood, gave this psychologist the kind of the tipping the ALJ, in all likelihood, gave this psychologist the kind of the tipping power here, is because even though the individual primary purpose might power here, is because even though the individual primary purpose might be to get an education, the ALJ didn't want be to get an education, the ALJ didn't want the child remanded, so to speak, back to the school unless the child remanded, so to speak, back to the school unless they were assured that the child wouldn't be violent, or wouldn't act in some way that was detrimental to the school or to himself? With all due respect, I don't agree with that. I think the ALJ, and of course we're trying to understand what the ALJ's motives were, but I believe the ALJ wanted to make sure that the student, these were frankly lower income parents, and I think the ALJ and the legal proceedings are expensive, and I think the ALJ, for the one year duration of her order, was trying to make sure that the student's educational needs, as they're defined under IDA, as academic and functional, were taken care of. Well, I don't disagree with that, but that doesn't have anything to do with what I just said. Okay, well I apologize for that. Judge Ezra, would you answer it again? My apologies. No, that's okay. You're out of time, and I think you're in agreement, so I think you just misunderstood his question. I think you did. Thank you. Judge, in answer to your request, a site to the record is pages 11, 28, and 29. It's part of finding, I believe it's 69, and it refers to parents exhibit number 135, and it talks about his schizophrenia and his substance abuse, and says children's recommended he enter a residential facility, as Dr. Cachette had recommended six months earlier. And that's part of the findings, and that's the reference. So you're saying that's ER 11-something? It's page 11, 28, and 11, 29. Of our excerpts of record? Because my excerpts of record don't go anywhere near that high in number. It's part of the decision. While I'm reading, it's part of the Administrative Law Justice decision, and it's at page 36 and 37 of her decision, and it references parents exhibit 135. And I may have been saying that I thought those were the numbers to the record. It couldn't be our record as far as I know, so it must be some other numbering, but I'll look at the ALJ decision. The point I'd like to make is take a look at your case and say, what's the primary reason for the student going and being in a secure facility? And we believe it's medical, not educational. He was successful in the program that he was in. It was a minimal special education program. Once they make the unilateral decision to place a student there, the parent has the right to do that. The question is whether we pay that. And whether we pay it determines, at the time he is admitted, what was the primary purpose for it. There's something that's bothering me about that. I now understand your focus on that. Let's suppose you have a kid who's in and out of a diabetic coma. So he's sent to a facility and they stabilize his diabetes with proper doses of insulin and determining exactly how much he needs. No question he was sent there because of an entirely medical and not an educational reason. But let's say once they stabilize him, they think, well, this kid's diabetes is too unstable. He has to stay here for a while. So they plan a school day for him. And all the rest of the time that he's there, which is a long time, he's going to school and just going to the school nurse and getting his insulin shots. It strikes me that that's analogous here. And it makes a clear distinction between why the kid was sent there, which was medical, and why the kid is there for the remaining time, which is primarily educational with just a little medical support, just like going to a school nurse in a public school. But the question is for how long? I think you have to make the determination at the outset when they go there. And that controls? So if the kid is having a medical crisis and is sent to a facility and let's imagine, I suppose, the extreme end of the hypothetical. It takes one to three days to stabilize him. And then he's there going to school for a year. That reason why he was sent there would control. At any point in time, he has absolute right to come back. And there's new information for an IEP meeting. He has absolute right for continuation of education in the public school district. It's truly incredible when we take a student and transport him in a secure transport to Utah to educate him and say they have to educate him. In reference to your saying, is there an educational program? At Western State Hospital, I can tell you it's a psychiatric resident hospital. They have a program educational program that's a full day program. That doesn't mean that the district has to pay for it when he's there. That he's under program. When you look at mental health and the treatment of it, you're right. You're not sitting there and you're not under continual treatment. So the district court held that this was educational and not medical and we review that for clear error, right? I think the district court was sitting in DeNovo, but I don't believe it's just clear error. I think it's like a summary judgment. If you look at the Clovis and the two Ashland cases, they establish a standard and he never reached that standard. If you reach that standard, there's just not a dispute. Your way over your time. Thank you, Counsel. Thank you, Judge.
judges: Kleinfeld, Friedland, Ezra